Memorandum of Decision
This is an action for the termination of parental rights of Emily K. and Jorge L., the biological parents of the minor children Michael, born June 27, 1991, Susana, August 5, 1992, and Jose, born March 28, 1994. These children have previously been found to be neglected children on January 10, 1997 (McLachlan, J.). The children have been in foster care since February 2, 1996. The petition was filed by the Commissioner of the Department of Children and Families ("DCF") on March 17, 1998.
The father of these children is now and will continue to be incarcerated in the Commonwealth of Pennsylvania for a number of years into the future.[2] The respondent father has been served with the petition and has written to the clerk of the court asking to participate in these proceedings. He has court appointed Connecticut counsel. He is and his attorney were willing to participate in the trial via video conferencing or telephone conferencing, a procedure which comports with due process according to the Connecticut Supreme Court. In Re Juvenile Appeal 187 Conn. 431, 437 (1982)[3] This court has utilized this procedure with success for incarcerated respondents in California, Florida, New York and New Jersey. Efforts by the judges and staff of the Child Protection Session of the Connecticut Superior Court over the course of four months, to secure the cooperation of the Department of Corrections in Pennsylvania in order to establish a video conferencing trial for the imprisoned father have failed. Efforts to establish a trial with telephone communications with the imprisoned father have met with equal frustration. As a consequence, the termination of parental rights trial here in Connecticut must be bifurcated to allow for a trial as to the mother only, at this time. Regrettably, this will result in delayed permanency of placement for these desperately needy children presently in foster care.[4]
The court finds that there is no proceeding pending in any other court affecting the custody of the children. The court heard from a DCF social worker and a licensed clinical social worker-psychotherapist for the children, the maternal grandparents from Pennsylvania, foster parents, Saul J. Karpen, an assistant professor of pediatrics and specialist in gastroenterology and hepatology from the Yale-New Haven Hospital, CT Page 1144 a permanency planning social worker and the respondent mother. The court received into evidence social studies, court approved expectations signed by the parents, arrest and conviction records, a psychological evaluation and letters from service providers and therapists. The trial occurred over two days
The court makes the following findings by clear and convincing evidence. The sociological history of the parents was presented in the form of testimony of the social workers, psychological evaluations and the social study. (Exhibit # 22). This social history was essentially unchallenged by the parents or their counsel.
This is a case essentially arising out of the Commonwealth of Pennsylvania. The mother, Emily was born and raised in Pennsylvania and currently resides there. In a metaphor, Emily was not dealt a good hand in life and has played her few cards very poorly. One of her worst moves in life was to associate with a man that came to be the father of these children. Jorge L., the children's putative father, is presently incarcerated in the State Correction Institution at Cresson, Pa.
Emily was raised in Pennsylvania and attended local schools until she quit after the ninth grade. She is the third of three children of an extremely dysfunctional marriage. One sister is retarded and in placement in a state home in Pennsylvania. She describes her childhood as abusive. She reports that her father was an alcoholic and drug addict who sexually abused her. (Petitioner's Exhibit # 10) "She witnessed many scenes of violence between her mother and her mother's boyfriend and experienced physical abuse herself from him. She moved out without completing high school. Emily reported to a psychologist that she had a previous psychiatric history at age 10 or 11 years where she saw a psychiatrist once a week. (Exhibit # 19) She reports using alcohol at age 15, marijuana and cocaine at 18 and smoking crack cocaine at age 21. She lived with various friends until she met Jorge when she was 18 years old. She became pregnant by him. They never married.
Jorge was a drug dealer according to Emily. She began the casual intranasal use of cocaine that Jorge made available to her. She used it on week-ends and denies using cocaine during her pregnancies.[5] While living in Erie and while she was pregnant, she and Jorge and another couple were arrested after they left a K-Mart department store with a shopping cart filled CT Page 1145 with three hundred dollars worth of merchandise. They were all charged with conspiracy to commit retail theft, according to Emily's testimony. The other couple involved in the shoplifting were discharged from the criminal proceedings by receiving two years of probation. Emily says that Jorge got six months in jail for this crime and did serve some time in prison. She says that she was awaiting the birth of her first child before she was to be sentenced. Jorge completed his jail time. He was still on probation or parole when he was arrested again on a drug charge. Jorge knew he would have to go back to jail. He convinced Emily that since their first child, Michael, had now been born on June 27, 1991, that the court was now very likely going to sentence her to jail. She cried as she recalled that she did not want to go to prison and leave her baby. Her understanding was that "Judge Connelly told me I was going to get a maximum of twelve years," likely an advisement of the maximum possible sentence for the crime. Jorge told her to leave with him immediately for Puerto Rico. She did. They became fugitives from justice.
She remained with Jorge in Puerto Rico for two years. Since she was unable to speak Spanish and had no support network, she testified that she was unable to get drugs while in Puerto Rico. Homesick, Emily left Jorge and returned with young Michael and the infant, Susana, to live with Jorge's niece in Waterbury, CT. Soon, Jorge left Puerto Rico and also came to Connecticut to resume living with Emily. It is not clear what life was like in the home; what kind of parenting occurred; what kind of stimulation and nurturing the children saw or didn't see. Some things did emerge from the testimony at trial. The children developed horrific emotional demons while living with Jorge and Emily.
These children did not have a stable physical environment, moving frequently from friend to family, apartment to apartment, state to state. The children did not have the stimulation, nurturance and affection of mature, pair-bonded parents. For these children, the pregnancies were not planned, and for Jose, not wanted. Some of the pregnancies likely resulted from unprotected sex while the parents were impaired by cocaine.
For these children the teen-age mother had not completed high school, she was low-functioning intellectually and vocationally,[6] she was not married and estranged from her dysfunctional family of origin. No abiding religious or moral values appeared to be present. Both of the children's parents CT Page 1146 were abusing illegal drugs, tobacco and/or alcohol during the time the children resided with them. The mother does report that she did alter her substance abuse habits as an accommodation to her pregnancies. She reports to six pregnancies, three terminating in miscarriages or abortion (Exhibit # 7) She does not report adequate pre-natal care for herself or her unborn children. All live births were born medically fragile and impaired.[7] The mother was herself poorly parented and she was overwhelmed by the neediness of the children. The mother reports the father of the children was controlling, jealous, unhelpful, physically abusive and sexually demanding of her. She reports that he threatened to turn her in as a fugitive from justice if she denied him sex. She reports that Jose's pregnancy was unwanted and resulted from Jorge's threats and sexual demands. She reports to frequent calls to the police whom, she claimed, would not assist her. Emily further reported that Jorge has a total of thirteen children from various maternities and that he does not support or care for any of these children. She says that she met Jorge's ex-wife and that both the former wife and Jorge were criminally involved and on probation. These children were born into a situation at high risk for abuse and neglect.
For Jorge, the use of the word "father" is clearly a euphemism. Jorge fits the classical portrait of a neglectful parent. That profile contains many of the following attributes. The father is frequently: a) uncertain of his paternity, b) incarcerated, c) substance impaired, d) criminally active, e) psychiatrically impaired, f) tragically under-educated (often, uneducable), g) occupationally below community standards, h) low-functioning and/or, all of the above. In this case, Jorge fits substantially in this mold. He is the second youngest of sixteen children. He was born in Puerto Rico, attended school for nine years and moved to Pennsylvania when he was fourteen. He reports to unskilled labor in a juice factory and a meat factory. In Puerto Rico he and Emily worked as orange and coffee pickers. Jorge, is a self-described poly-substance abuser who, not surprisingly, fell down at a factory job, injured a kidney and has been collecting Social Security every since.[8]
Jorge did not involve himself in the household chores. He was not willing to ease the maternal burden. It is was not his obligation to see that Michael went to school, even though he was at home and Emily had gone to a DCF directed service program. The early records show Michael, the oldest child, to be chronically absent from school to the point of severe educational neglect. CT Page 1147 Despite her continued occasional use of drugs herself, Emily did try to follow some of the recommendations of the early DCF service providers. She also, on her own, not at the request of DCF, obtained employment as a waitress at a pizzeria. She worked from 10:30 AM. until 5:30 PM. If the next shift waitress didn't show up, Emily worked until midnight. The children were left with Jorge and his colleagues.
Emily said "The guy don't do nothing." He would not help her with the care of the children; change the children, get up in the night with the colicky child, do the laundry from time to time, or to baby-sit while mother tends to her other personal and household duties. Even though he was not regularly employed, Jorge didn't offer to take the children to the pediatrician, to grocery shop or to read "Green Eggs and Ham" or "Goodnight Moon" to the children. It is unlikely that Jorge held his new-born, cuddled them, made eye contact with the child, or sang and stimulated the infant's developing brain. Jorge's interest was drugs. He only rarely used his social security assistance to pay the rent. When things were desperate, Jorge would sell household goods to get money for drugs. Emily testified that on one occasion she took her youngest, sickest child to the hospital for a check-up. When she returned home Jorge had sold the child's "breathing-machine" to get money for drugs. On another occasion he sold a child's snowsuit.
The early referrals to DCF began to occur in May, 1995. Michael was almost four, Susana was two and a half, and Jose was one. Jose had been born with a condition known as biliary atresia. It is a severe, life-threatening chronic, progressive liver disease (Petitioner's Exhibit # 5) which requires frequent hospitalizations. He requires a liver transplant within the near future. He spent the greater part of the first year of his life at the Yale-New Haven Hospital. He required surgery and after the surgery Jose had frequent serious infections. The pediatric gastroenterologist and hepatolgist who testified in court said that Jose was receiving substandard care at home and was poorly nourished. Jose and his mother, at times, missed visits for medical care. As a result of Jose's frequent hospitalizations, where he no doubt was stimulated and nurtured by the nursing staff, and his subsequent removal from the parents at about age one, Jose was the least emotionally damaged of the three children.
Seven referrals to DCF were made in 1995. DCF investigated CT Page 1148 and placed "wrap-around" services in place to support the family in the home. The referrals to DCF were made by neighbors and the service providers. These referrals involved allegations of drug abuse by both parents, educational neglect, non-compliance with the services, domestic violence and overall neglect. (See Affidavit of Marci Craft, appended to original neglect petition).
The family received $1800 per month from SSI, SSA, AFDC, and food stamps, yet there was inadequate food in the home and mother resisted requests of service providers to get a telephone so they could reach her and she could contact medical care providers regarding Jose's condition. The affidavit of the social worker is replete with documented observations of neglectful care of the children, Susana wandering in the street, Jose with inadequate clothing and dirty, soiled diapers, rashes on the children, infectious sores, poor attendance at school and preschool, and missed medical visits. When asked about these problems "[Emily]. laughed and said `I don't know, its hard for me'."
One of the things that made life physically and financially stressful for Emily was that both she and Jorge were "doing drugs." Emily tested positive for cocain at the Joseph Center where she had been referred. She was accepted in to their out-patient program for substance abusers, but was unsuccessfully discharged from the program on Jan 2, 1996 for failure to comply. She again tested positive at the Morris Foundation, another service provider on January 22, 1996. Again she was accepted for treatment and failed to attend. Jorge, at all times relevant, refused to be tested and refused services offered by DCF.
On February 2, 1996, the DCF worker visited the home. There was no food, the children were filthy and neither parent had been compliant with the various service providers. A decision was made to remove the children. Michael announced that he was "happy to go." He described being hit by his parents and the babysitter, Wendy. Michael told the social worker that he and Susana and Jose had been hit "again, again and again."
The three children were brought to a foster home where Jose remains to this date. The older two children have been moved several times since this early placement. The physician from Yale-New Haven described this foster home as "excellent and loving." When the children arrived in foster care Jose had a bottle filled with sour milk. His clothes were too small. His diaper was filled with feces and urine and he had a severe diaper CT Page 1149 rash on his buttocks and inner thighs "to the point of near bleeding." Susana, who urinated in her pants and on to the floor, was found to have a diaper-type rash as well and had no under garments on. Her sneakers were soaked with urine.
The children were all hungry. They ate three bowls of pasta according to the foster mother. The children had no table manners and did not know how to use a fork. They grabbed food with their hands and were obsessed with eating. At first, the foster mother allowed them to eat at will, but later she began to limit their eating and snacking and taught them to use table implements.
Sleeping for the children was problematic from the very beginning. They were inconsolable, afraid of the dark, Susana was incontinent, and they screamed virtually all night, afraid of a Spanish ghost.[9] Susana was speech delayed, she threw her shoes and refused to stay in her bedroom at night. The foster mother said it took six months before they all slept through the night. The children's other behavior was equally troubling and exacerbated after visits with the children's mother, Emily.
Emily had admitted to social workers and counselors that Michael would swear at her, that Susana would bolt out of the house from time to time, and that she struggled dealing with Jose's numerous physical treatments. Emily testified that she thought she was close to Susana ". . .but she is real different from the boys. She didn't get close to me." She testified she only had a real good relationship with Michael.
These problems were magnified when the children first went into foster care. The foster mother was able to do the most for Jose. He was the youngest and least corrupted by the years of neglect. He was also the physically neediest due to his biliary atresia. His gains physically and emotionally were early and remarkable. The pediatrician at Yale could not say enough about the quality of his care, his physical improvement and his emotional gains in foster care. The foster parents took a six week course to learn cardio-pulmonary resuscitation and to care for a medically fragile child. The other two children, Michael and Susana, who had been with their natural parents for a longer period of their young lives were more emotionally and behaviorally impaired. Michael would say things like "Bitch, get that!" He was abusive to his siblings. His conduct was difficult and disordered. Susana was worse. She would run out of the house for no apparent reason. She would continually masturbate herself, CT Page 1150 putting such things as dolls in her vagina. She would do it in front of her foster parents, in the stores, in her room, anywhere and everywhere. There was no particular pattern to her masturbation. The foster mother said it was difficult to talk to her because you thought she was comprehending but she wasn't. She would throw her food off the table. The foster parents were patient and consistent. The child worked with a counselor at Child Guidance clinic. Gains would be made only to be off set by regressive behavior following visitation with their mother.
After many months the foster mother reported that Susana started to fit in better. She felt safe; she stopped wetting the bed, she stopped masturbating, she would climb on the foster mother's lap when they watched TV; she overcame her fear of men and became comfortable with the foster father.
As a consequence of Emily's arrest in Connecticut for risk of injury to her children, the Pennsylvania authorities found out about her arrest and sought her extradition to Pennsylvania. She was extradited in late 1996. On January 29, 1997, Emily was sentenced as a fugitive to four months to two years in prison. She served at Cambridge, Pennsylvania for eight months until July 20, 1997. She was released and is presently on parole until the year 2000. At the same time Emily was extradited, DCF had an Interstate Compact home study done on Emily's mother's home in Pennsylvania since her mother was willing to undertake the care of Michael and Susana. On February 24, 1997 the two older, healthier children were sent to live with their material grandmother, Beverly, and her male companion of nine years, Ira. Both came to Connecticut for this trial and testified.
They independently testified that the children behaved within normal limits for children of their respective ages. There was no bed-wetting, no masturbating, no bolting from the house, no nightmares and no unusual behavior. Beverly would take the children once a week to visit their mother, Emily, in jail. Beverly told the children she was their grandmother and wished to be called that. Beverly testified that the children did not view Emily as their mother, they viewed her as "Emily." Emily was released from prison on August 8, 1997.
Upon her release, Emily went back to live with her mother and Ira and the two children. After approximately two weeks, Beverly gave her daughter permission to go out and have some time to herself. Emily went out for the night and didn't return until the CT Page 1151 next day. For reasons known only to Beverly and Emily, the children's maternal grandmother, Beverly, became ". . . very furious. We had words, the next thing you know, I felt like I was going to punish her (Emily) by sending the kids back. But I punished myself and I punished those children. I didn't realize there would be this many problems."
Beverly did send the children back to Connecticut. The DCF officials responded to the Pennsylvania child protection agency's telephone calls that the placement had gone bad. A DCF worker went to Pennsylvania to pick up the children. The children had been shuffled one too many times. The maternal grandmother could not have imagined the devastation it would cause to these two children. In psychiatric terms, they seriously decompensated.
The children who had lived in Pennsylvania, Puerto Rico and multiple locations in Connecticut with their very inadequate parents, went to foster care for a year, went to their maternal grandmother's for six months and were then returned to foster care. One witness called their reaction an attachment disorder. Susana completely regressed to her earlier primitive behaviors. She ran away, wet her bed, she was fearful, insecure and resumed masturbating. Her conduct was disordered for as much as six hours a day. Her foster mother tried to resume her patient, supportive and structured care. She got Susana in individual treatment. Gradually, patiently over seven months, again Susana improved. But only until April 22, 1998, when Emily was permitted to talk to Michael and Susana on the telephone, long distance from Pennsylvania to the Connecticut DCF office.
The foster mother reported, and the child's therapist confirmed, that after the telephone "visit" with Emily on April 22, 1998, Susana went haywire. She began running away four or five times a day. She would sit on the ground eating rocks. She would "go crazy," biting, kicking, stripping her clothes off, and mostly just masturbating, according to the foster mother. She would blow her nose in her hand and wipe it over things, she was destructive to furniture, she told the foster mother that "Emily was coming to get her." She was "massively non-compliant." Since May, 1998 Susana has been in two different psychiatric institutions, Hallbrook and the DCF children's psychiatric hospital at Riverview. Her individual therapist says that she meets all the diagnostic criteria for autism. She remains institutionalized. She is no longer permitted even telephone contact with Emily. CT Page 1152
Michael has been placed in another foster home. He does not have contact with his siblings for treatment purposes. He needs the space and time to allow him to bond in his present foster care environment. He has slowly abated his temper tantrums. He has been diagnosed with post traumatic stress disorder. (Exhibit B.)
Jose remains with his caring and supportive foster family where he was initially placed. His pediatrician and hepatologist, Dr. Karpen, reports that Jose's intellectual, cognitive and emotional development has "truly blossomed in this new household." He sees comfortable parent-child and family interaction. Jose's liver condition continues to worsen despite excellent physical and medical care. The foster mother reports that he is high on the list for a liver transplant. He is susceptible to life-threatening gastrointestinal bleeding and life-threatening bacterial infections. Jose gets serious infections of the liver causing him to have high temperatures and frequent hospitalizations. The foster mother works with visiting nurses once a week and daily when Jose is sick. His condition sometimes manifests itself when he vomits large quantities of blood and clots which, according to Dr. Karpen, comes from engorged blood vessels secondary to fever. The internal bleeding also produces very bad bloody bowel movements. Jose requires specialty therapies to reduce the chance of bleeding.
The foster parents would like to adopt Jose. Jose's physician and the court are grateful to the foster parents for" the way these parents can open their hearts and open their house" to this child. (Exhibit # 5 p. 2)
 Adjudication
With respect to the statutory grounds for termination of parental rights of the mother, Emily K., the court finds by clear and convincing evidence that these children have previously been adjudicated neglected and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, she could assume a responsible position in the lives of the children. General Statutes 17a-112(c)(3)(B). The court finds that this ground has existed for more than one year.
 Mandatory Findings:
CT Page 1153
The court makes the following factual findings required by17a-112(e):
1) Appropriate and timely services were provided by the Department of Children and Families, including parent training, substance abuse counseling and treatment and individual counseling, transportation assistance, and visitation coordination. (See in particular Treatment plans, exhibit 21 and the social study Exhibit # 22 p. 8).
2) The court finds by clear and convincing evidence that the Department of Children and Families has attempted to comply with federal law. DCF made reasonable efforts to initially keep the family intact and later to reunify the family, given the situation and circumstances, as far as possible. Many services were provided prior to removal and services were offered following removal including Family Preservation, Waterbury Youth Services, Family Ties, Morris Foundation, Connecticut Counseling, and Healthy Choices. If there has been any failure to comply with federal law with respect to observing the federal guidelines for permanency planning, the problem is with interstate cooperation. The resolution to this problem may require federal legislation.
3) The Department, with the approval of the Court, set reasonable and realistic expectations in order to reunify the family. There was good attendance by the mother but there was no measurable progress toward the goal of parental rehabilitation. She is working on Christian programs, such as Home Bible Studies, toward her personal rehabilitation but her knowledge of the children's emotional and physical needs is remarkably lacking. The statute requires that she make progress in parental
rehabilitation. See discussion infra, and her psychological profile, Petitioner's Exhibit # 7. These children have pervasive specialized needs which require better than average parenting skills. Emily has only demonstrated extremely substandard parenting skills and a continued propensity to engage herself with dysfunctional, abusive men. In Re Christina V.38 Conn. App. 214, 224 (1995)
4) Jose has strong emotional ties with his foster family who has provided the physical, emotional, medical and educational support he needs. Jose has no positive emotional ties to the biological parents. Michael is beginning to bond in foster care. Susana is deeply disturbed. Her relationship with her female biological CT Page 1154 parent is the source of a great deal of Susana's problems according to her counselor. Contact with the biological parents would be extremely detrimental to these children.
5) Finding regarding the age of the children. Michael is almost 8. Susana is six and a half. Jose is five years of age. They have been in foster care for much of their lives. They deserve a permanent, structured, stable, caring, nurturing environment that the foster parents are willing to permanently provide. None of the parents is able to provide, nor has offered the children a plan for a secure home at this time.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The mother has regularly attended her parent training but was unable to internalize and benefit by the training. Giving her additional time would not likely bring her performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C. 210 Conn. 157 (1989);In re Juvenile Appeal 183 Conn. 11, 15 (1981).
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. The Department initially attempted to encourage contact and promoted visitation between the mother and her children. She was unable to sustain the regular visitation schedule. Her incarceration has been a barrier to her maintaining a relationship. No unreasonable conduct by the state child protection agency is noted. The mother was offered regular visitation even while in prison. The court finds that further contact with the parents is not in their best interest.
 DISPOSITION
The court finds that these grounds and circumstances have existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the children's best interest to terminate the parental rights of Emily K. at this time. As earlier indicated, the court is unable to act on the pending petition to terminate the rights of Jorge L. at this time. This best interest finding is made after considering the children's sense of time, their need for a secure and permanent environment, the relationship that the children have with their foster parents, and the totality of circumstances that the termination of maternal rights is in the children's best interest. In reCT Page 1155Juvenile Appeal (Anonymous), supra, 177 Conn at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyond the BestInterests of the Child 99 (1979).
 Order
It is accordingly, ORDERED that the parental rights of Emily K., as to the three children are hereby terminated. A final adjudication of the paternal rights of the children's father cannot be made at this time. The petition to terminate his rights is still pending.[10] A copy of this opinion may be released to any individual, governmental agency or authority which may assist in securing the cooperation of the State of Pennsylvania or in securing federal legislation to compel the State's to cooperate in implementing the Adoption and Safe Families Act of 1997.
By the Court,
_____________________________________ Francis J. Foley, Presiding Judge Child Protection Session
[2] His earliest release date is October, 2002 and his maximum release date is April 25, 2011, according to Richard Hamor, his Pennsylvania corrections counselor.
[3] Applying the due process rights balancing test of Mathewsvs. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893 (1976), the Connecticut Supreme Court approved the telephone conference as appropriate when balanced against the child's need to have a permanent nurturing and safe environment. The court found California, Nevada and North Dakota cases in accord.
[4] The delays occasioned by Pennsylvania's lack of cooperation is in seeming defiance of the spirit, if not the letter, of theAdoption and Safe Families Act of 1997, 42 U.S.C 671 et seq., which requires State's to implement procedures for the permanent placement of children in foster care within twelve months of placement. Without the cooperation of Pennsylvania to allow Jorge to participate in a trial, his parental rights cannot be constitutionally terminated.
[5] She admitted to a substance abuse counselor that she used alcohol, became drunk and passed out while she was two months pregnant with Jose.(Exhibit # 10).
CT Page 1156
[6] Intellectually Emily has an average IQ. Her functional limitations are likely the result of her poor reading abilities and lack of formal academic training. (Petitioner's Exhibit # 19)
[7] Michael had meningitis, Susana had asthma and Jose had biliary atresia, all diagnosed within the first two months of life.
[8] It is unknown if he is still collecting social security while in prison. He does not provide any of his social security for the support of these children. It is unknown for how many dependents he is being paid.
[9] From the description of the non-Hispanic foster mother it is likely that the children were saying something like `El cuko te coje,' from a Puerto Rican idiom, loosely "The ghost is going to catch you." Ironically, a seminal work on the horrible effect of abuse and neglect on children is called Ghosts from theNursery, Tracing the Roots of Violence, Karr-Morse and Wiley, The Atlantic Monthly Press, New York (1997).
[10] Neither the petitioner, her counsel nor the children's attorney appear to have noticed that the extension of commitment expired on January 10, 1999.